E. BONEY, ADMINISTRATOR, *v.* ATLANTIC COAST LINE RAILROAD COMPANY.

(Filed 3 May, 1911.)

1. **Witnesses—Expert—Qualification.**

   For expert evidence to be competent there must be a finding by the lower court, or an admission, that the witness was an expert.

2. **Same—Negligence—Opinion Evidence.**

   A locomotive engineer, not qualified as an expert upon the trial, who was not present at the time the injury causing the death of plaintiff's intestate occurred, the intestate being an engineer on a passenger train and killed while running his train thirty-five miles an hour where the defendant's rules required a speed not exceeding six miles, is not competent to give testimony as to whether the injury would have been caused had the intestate complied with the rules of the company.

3. **Appeal and Error — Evidence—Questions—Expected Answers— Harmless Error.**

   On appeal it must appear that the refusal of the trial judge to admit evidence is with prejudice to the appellant, and when a question is asked, and it does not appear of record what the witness would have answered, or what was expected to be proved by him, no reversible error is shown.

4. **Railroads — Engineer — Excessive Speed — Contributory Negligence—Proximate Cause.**

   When it appears that plaintiff's intestate, an engineer, was killed by a collision of his passenger train with another train at a station which it was entering, the rules of the company, known to him, prescribing that under the conditions a speed over six miles an hour was prohibited and he was running thirty-five miles an hour, an instruction that the jury should find the intestate guilty of contributory negligence which would bar his recovery, leaves out the essential point that it must proximately cause the injury, and is an improper one.

5. **Pleadings—Contributory Negligence—Instructions.**

   In order for a defendant to avail himself of instructions relating to plaintiff's contributory negligence as a bar to his recovery in an action for damages it is necessary for the defendant to set up the defense of contributory negligence in his answer.

6. **Pleadings—Contributory Negligence—Allegations.**

   In this case the defense that plaintiff's intestate, an engineer on defendant's road, was negligently running at a speed in excess

of defendant's orders, and that he failed to stop upon a signal given, which caused the death complained of, is a defense of contributory negligence.

7. **Railroads—Engineer—Light at the Switch—Warnings—Location —Presumptions—Contributory Negligence.**

While running at night on defendant's passenger train and colliding with another train unexpectedly on defendant's main line where it was expected to go, the other train obstructing the track because of a broken switch, and where there were numerous tracks and switches, the plaintiff's intestate is not required, without qualification, to know the exact location of the broken switch so as to impute contributory negligence to him in not observing the rules of the company when there is no light appearing at such locations.

8. **Railroads—Collisions—Open Switch—Negligence—Presumptions.**

In an action for damages against a railroad company for negligently permitting a switch to be open so as to cause a collision at its station between a train run by the intestate, as engineer, and another train, a presumption of negligence on the part of the defendant is raised by the fact of the open track and the collision, and a *prima facie* case being thereby established, the issue as to defendant's negligence is for the determination of the jury.

9. **Same—"Rule of the Prudent Man."**

When plaintiff's intestate was an engineer on defendant's engine, running at night into a depot where there were numerous tracks and switches, where it was the defendant's duty to have the main line track cleared five minutes before his train was to arrive, and to turn on a red light as a danger signal if danger existed, the mere fact that there was danger of collision with another train on the main line, by reason of a broken switch, and that there was no light thereat, which was under the defendant's rules a signal to the intestate to stop his train, does not of itself bar the plaintiff from recovery, as a matter of contributory negligence, for the death of the intestate caused by a collision with such other train, as such would omit the rule of the prudent man.

10. **Same—"Last Clear Chance"—Questions for Jury.**

The plaintiff's intestate was killed while running as engineer on defendant's passenger train at night in going into a station, where it collided with another of defendant's trains, on the main line, which, under defendant's rules, should have been cleared for the passenger train five minutes before its arrival. The intestate was running at the rate of thirty-five miles an hour and the rules of the company prohibited an excess of six miles. The rules fur-

ther required that the intestate should regard the absence of a light at the switch as a signal to stop. There were numerous tracks and switches in the yard. An employee of defendant could have turned on a red light, an understood signal for the intestate to stop in time to have avoided the collision resulting in the intestate's death. *Held*, in this case it was for the jury to determine whether the intestate's negligence or that of the defendant was the proximate cause of the former's death, under the doctrine of the last clear chance.

**11. Railroads—Warnings—Switches—Lights—Evidence.**

When, in an action against a railroad for damages for the wrongful death of its engineer caused by a collision of the train he was running at night into a station with another train negligently permitted to be on the main line, and the question is material as to whether there was a white light showing at the time, evidence is sufficient to be submitted to the jury which tends to show that the "white glass" was turned to the main line at 8 o'clock that night, and that the injury was inflicted at 2 o'clock the following morning, the yard, lights, etc., being under the supervision and control of the defendant during that time.

APPEAL from *Whedbee, J.*, at the November Term, 1910, of DUPLIN.

This is an action to recover damages for the killing of the plaintiff's intestate by the defendant.

The plaintiff alleges that his intestate, G. W. Boney, was in the employment of the defendant as engineer, and that he was killed on the main line of the defendant near South Rocky Mount, while on duty, at 2.30 o'clock A. M. of 6 November, 1907, by running into an open switch and coming in collision with another train.

The plaintiff alleges various acts of negligence on the part of the defendant. The defendant denies that it was negligent, but admits that the intestate was killed while on duty in the manner alleged.

The defendant also pleads contributory negligence as follows:

For a further defense:

First. That the plaintiff's intestate was a locomotive engineer, and at the time of his death was engineer on a passenger train running from Florence, S. C., to Rocky Mount and beyond; that the printed schedule containing the time-table of the de-

fendant's different trains, and also the rules and regulations to be observed by conductors and engineers running their several trains are furnished when issued to all of its conductors and engineers; that the time-table and schedule which was in force and effect at the time mentioned in the complaint was numbered ten (10) and went into effect 15 September, 1907, at one minute past twelvé A. M.; that this schedule or time-table contained the following rules and regulations:

"All trains passing through Rocky Mount and South Rocky Mount will approach passenger station at Rocky Mount, N. & C. main line cross-over, cross-over at Bassett street telegraph office, South Rocky Mount and middle yard cross-over, under full control, expecting to find tracks occupied. Trains will not exceed six miles per hour passing these points."

That the collision mentioned in the complaint happened at one of the points mentioned in the said rules above quoted. A copy of this schedule containing the said rules and regulations was duly given and furnished to the plaintiff's intestate at the time or before the said schedule and regulations and rules went into effect, and it was his supreme duty to inform himself of all rules and regulations and the time-table applying to his district, and in particular to carefully obey and comply with the rules and regulations above quoted. That in addition to this the following rule was issued from the transportation department:

"ROCKY MOUNT, N. C., 9 September, 1907.
"BULLETIN No. 18.
"*C. & E. and All Concerned:*
"All trains passing Rocky Mount and South Rocky Mount will approach passenger station at Rocky Mount, N. & C. main line cross-over, crossing at Bassett street telegraph office, South Rocky Mount and middle-yard cross-over, under full control, expecting to find track occupied. Trains will not exceed six miles per hour passing these points.          "W. B. DARROW,
"*Superintendent Transportation.*

"Richmond, Manchester, Weldon, Rocky Mount, South Rocky Mount, Pinners Point, Tarboro, Contentnea, Wilmington, Florence, Selma."

Second. Defendant further alleges that the plaintiff's intestate was guilty of negligence which directly contributed to bring about the injury complained of in the complaint, in that the plaintiff's intestate, while approaching the point where the accident occurred, was given the danger or stop signal by waving a lantern in the usual manner and acknowledged the same with his whistle, but failed to stop his train in time to avoid the accident; that if plaintiff's intestate had obeyed the instructions given in the schedule or time-table and bulletin above mentioned, he could have stopped his train in time to have avoided the accident, but that at the time he was disobeying and violating the said rules and regulations and instructions aforesaid, and running at a very high rate of speed, between forty and fifty miles per hour.

The following facts seem to be undisputed:

(1) That the intestate was running a first-class passenger train as engineer, at the time he was killed, on the main line of defendant; that the train was going north and the track was straight for more than two miles.

(2) That he was killed by running into an open switch, and colliding with another train.

(3) That as he approached the switch, his train was running at the rate of 30, 35 or 40 miles an hour.

(4) That the rules of the defendant required him to approach this switch at six miles an hour.

(5) That a switch lamp was maintained at this switch with a white and red light, and when the white light was turned to the track, it indicated safety and that the switch was all right for the main line, and the red light indicated danger.

(6) That the following rules were in force:

Rule 13, page 15. Any object waved violently by any one on or near the track is a signal to stop.

Rule No. 934. They (engineers) must have a copy of the current time-table, to which they must conform in running their

trains, and a full set of signals which they must keep in good order and ready for immediate use.

Rule 27. A signal imperfectly displayed, or the absence of a signal at a place where a signal is usually shown, must be regarded as a stop signal, and the fact reported to the superintendent.

Rule 7, page 14. Employees whose duty may require them to give · signals must provide themselves with proper appliances, keep them in good order and ready for immediate use.

Rule 91 (A), page 31. The speed of a train would ordinarily be that of its schedule, but in cases of delay may be so moderately increased as in the judgment of the engineer and conductor will be safe and prudent, due consideration always being given to condition of track, weather and all circumstances.

Rule 93, page 32. Within yard limits the main track may be used, protecting against third and fourth-class trains.

Third and fourth-class and extra trains must move within yard limits prepared to stop unless the main track is seen or known to be clear.

Rule 93 (a), page 32. Engines working within yard limits must clear the time of first-class trains five minutes.

Enginemen must know that switches are properly set before they attempt to pull in or out of siding.

B-72. Trains of the first class are superior to those of the second; trains of the second class are superior to those of the third, and so on.

(7) That the switch track led from the switch at which the intestate was killed on the main line, to what is called the lead track, which ran about parallel with the main line.

(8) That as the train on which the intestate was, approached the switch (the distance from it being in dispute), another train of the defendant was on the lead track.

(9) That this last train consisted of an engine and fifteen cars of coal; that the cars were in front of the engine and the engine was running backwards.

(10) That it was the intention of the defendant for this train to remain on the lead track, but when it reached the switch going from the lead track to the main line, this switch was open

or out of fix, and the train passed through the switch, across the switch track, through the switch to the main line and on the main line, and as the intestate was approaching it ran back on the switch track, where the collision occurred.

(11) That the switch at which the intestate was killed was on the yards of the defendant at South Rocky Mount, and that there were numerous tracks and switches in said yards.

The facts in dispute relate to the condition of the switch at the main line; the condition of the lights at this switch; the conduct of the conductor, named Cole, in charge of the train that came from the lead track, after he discovered the switch at the main line was open; the distance from the switch, at that time, of the train on which the plaintiff's intestate was running, and the conduct of the plaintiff's intestate.

The plaintiff contends:

(1) That the switch at the main line was broken, and that the defendant has given no satisfactory explanation why it was so.

(2) That if the explanation of the defendant is accepted, that it was caused by the engine and cars running from the lead track, that this would not excuse the defendant, because the engine and cars could not have reached the switch at the main line but for the negligent act of the defendant in permitting the switch at the lead track to be open or out of fix.

(3) That a white light was turned to the main line, indicating safety, or there was no light at the switch, and the purpose of lights at the switch is not only to show its condition, but also its location.

(4) That at the time the conductor Cole discovered the switch was broken, he was at the switch, and the plaintiff's intestate was distant one and one-fourth miles; that he (Cole) could then have turned the red light to the main line, and if he had done so, it would have been seen, and the train on which the intestate was could have been stopped.

(5) That instead of doing so he waited until the intestate was in twenty-five yards of the switch before he gave any signal, and when he did so it was by waving a lantern some distance from the track and not across it.

The defendant contends:

(1) That it explained the breaking of the switch; that it was broken a few minutes before the plaintiff's intestate was killed by the train coming from the lead track, and was the result of an accident.

(2) That there is no evidence that it was negligent in leaving the switch at the lead track open, but if this was a negligent act it was remote, and not the cause of the death of the plaintiff's intestate.

(3) That there is no evidence that the white light was turned to the main line, and if there was no light at the switch, this was notice to the plaintiff's intestate to stop, under the rules of the defendant.

(4) That at the time the defendant's conductor, Cole, discovered the switch was broken, the plaintiff's intestate was one-quarter mile from the switch, and if he (Cole) had then turned the red light on the main line, it would have been too late to stop the train.

(5) That the conductor, Cole, did all that a prudent man could do to avert any injury; that he waived his lantern across the track; that this was a danger signal, and if it did not cause the train to stop a red light would not have done so.

(6) That the plaintiff's intestate was running in violation of the rules of the defendant, and this was the cause of his death.

The material parts of the evidence are stated, but not all of it.

J. C. Mercer testified that he was police for defendant on its yards; that he went to the switch at 8 o'clock A. M. of 6 November, 1907; that he examined the switch; nothing was broken except the rod which throws the switch; that he tried to operate it, and it would not throw the switch, *but would turn the lamp; that the white glass was turned .to the main line.*

H. T. Cole, the conductor, testified: "As soon as I discovered that switch was broken, I ran down the track of the main line to flag No. 82 (Mr. Boney's train), and he was blowing the station blow when I signaled him down by stop signal, and he answered my signal by two short blasts, which was an answer to my signal, and understood that he knew what I meant, and then I stepped aside and he ran into the yard. Our train was then

moving ahead, trying to get out of the way. Mr. Boney was a good quarter of a mile when he answered my signal. I was twenty-five yards from the switch down the track towards Mr. Boney's train. He could have seen me for two miles signing him down. It was seventy-five yards from where switch left main line to where train collided with our train. *The wheels of my engine broke the rod which controlled the switch.  . . .* Boney blew the station blow and then immediately blew the two short blasts answering my signal. I got away far enough to keep myself from harm. I did not have time to get a red light and signal with, after I saw Boney's train was coming. I did not display any red light. I knew train was coming when I told engineer. It was an accident that we were out on the main line. We were trying to go on the lead, but got out on the main line. The switch which let us on the cross-over from the lead to the main line had been left open or was out of fix, so that instead of going on the lead we went on the switch which goes into the main line, then went on the main line; that is, the engine went on the main line and the switch at this point had the rod broken (that is, the switch at the main line). The only thing I know was when I got there the rod was broken, and I know of no other way it could have been broken except by my engine. I mean by that the engine I was using. I did not see the engine break it, but the engine had just got on the switch point at the main line just far enough to break the rod."

William Andrews testified: "I am fireman for defendant and have been for six years. Was on engine at the time of the accident. I was coming back dead-head to Rocky Mount from Fayetteville, to which point I had fired another train. I had run extra on this run for two years. Just as we got one and a quarter miles of South Rocky Mount station Mr. Boney blew one long blast. That was the station blow, and when he got within one mile of station, some one waved a white lantern, but not across the main line. He waved it across his body. I know what that meant. The signal was to stop. Mr. Boney shut off the steam. The man who gave the signal was twenty-five yards from the main line to one side. I do not know who he was signaling to. The yard engine blew Mr. Boney, and he

then blew two short blasts, and then he applied emergency brakes and stood up and reversed the engine. The switch is at the middle cross-over. *Mr. Boney was twenty-five yards from the switch when he answered the signal by two blasts and was in the switch or entering the switch when he put on emergency brakes.* Mr. Boney was running thirty-five to forty miles an hour when he turned off steam. . . . Mr. Boney *was one and a quarter miles from the switch when he blew the signal station blow and then he shut off the steam.* I was looking over Mr. Boney's shoulder. It was usual for them to have lights at switch, but I did not see any. *If there had been a red light at the switch Mr. Boney could have seen it in time to stop at the rate his engine was going.* I do not know whether the man was signaling with a lantern, was signaling a train on the switch in the yard to stop, or signaling the train we were on."

Two or more witnesses testified that they saw no light at the switch.

The issues and the responses thereto are as follows:

First. Was the plaintiff's intestate killed by the negligence of the defendant as alleged in the complaint? Answer: Yes.

Second. Did plaintiff's intestate by his own negligence contribute to his own death? Answer: No.

Third. What damage is plaintiff entitled to recover of the defendant? Answer: Ten thousand dollars ($10,000).

The defendant appealed.

*Herbert McClammy, J. O. Carr and George Rountree for plaintiff.*

*Davis & Davis and Stevens, Beasley & Weeks for defendant.*

ALLEN, J., after stating the case. The first and second exceptions are to the refusal to allow a witness for the defendant, J. M. Donlan, an engineer, to answer the following questions:

First. If the jury shall find from the evidence that Mr. Boney's train had been running at six miles per hour at the time it collided with the train, and the other train with which it collided was running slowly in the same direction, what would have been the effect on the train and engine on which Mr. Boney was riding?

Second. If the jury shall find from the evidence that the engine and train which were being driven by Mr. Boney had been running at the speed of six miles per hour or less at the time it struck the train of Conductor Cole, what would have been the effect of such collision and how greatly would it have damaged the train and imperiled the lives of those on board?

We do not think the ruling was erroneous. If the questions were asked of the witness as an expert, there is no finding or admission that the witness was an expert. As was said by *Justice Manning,* in *Lumber Co. v. R. R.,* 151 N. C., 220: "We cannot assume that his Honor, in this view, found the witness to be an expert, and then excluded the question and answer. In order that the witness might testify when objection is made, there must be either a finding by the court, or an admission or waiver by the adverse party that the witness was so qualified."

The questions were also not permissible to elicit the opinion of the witness, as he was not present at the time of the occurrence and the jurors were as competent to form an opinion upon the facts as he. *Taylor v. Security Co.,* 145 N. C., 385; *Wilkinson v. Dunbar,* 149 N. C., 20.

Again it does not appear that the defendant has been prejudiced by the refusal to permit the questions to be answered, as it is not shown in the record what would have been the answer of the witness, or what the defendant expected to prove by him.

The fourth, fifth and sixth prayers for instruction requested by the defendant were as follows:

Fourth. If the jury shall find that Boney was running his train at a greater rate of speed than six miles per hour at the time he passed the switch, then he was guilty of contributory negligence, and the jury will answer the second issue, Yes.

Fifth. If the jury shall find that Boney did not obey the rule set forth in the time-table, that he must approach the middle-yard cross-over and the switch where the accident occurred with his train under full control and expecting to find the track occupied, but in disregard of this rule approached the said switch and cross-over without having his train under full control, then he was guilty of contributory negligence, and the jury must answer the second issue, Yes.

Sixth. Even though the jury shall find that the defendant was guilty of negligence, yet if they shall also find that Boney did not obey the rule set forth in the time-table as to the rate of speed and manner in which he should approach the middle-yard crossing and switch where the accident occurred, then he was guilty of contributory negligence, and the jury must answer the second issue, Yes.

His Honor gave these instructions, except he added to each the element of proximate cause, which we think he ought to have done. The question of proximate cause will be considered in discussing other exceptions appearing in the record. The defendant relied principally on its motion to nonsuit, and the exceptions to the refusal to give the following instructions:

Seventh. That if the jury shall find from the evidence that at the time No. 82, the train being run by Boney, deceased, was approaching the switch into which he ran and the switch had no lights, either red or white, and Mr. Boney knew there were no lights, either red or white, as a signal at the switch at the time, and he failed to slacken his speed and stop his engine, then he was guilty of contributory negligence, and the jury will answer the second issue, Yes.

Ninth. That it was the duty of Mr. Boney, engineer, to know the situation and location of the switches leading into the main line of the South Rocky Mount yards, and to observe whether the said switches were lighted and the signals indicated by it, and if the jury shall find from the evidence that the switch lamp at the place of accident was not lighted either with red or white lights, then it became the duty of Mr. Boney, deceased, to. stop his engine and ascertain the cause, and to ascertain if it was safe to pass over the track at that point, and if he failed to do so, he was guilty of contributory negligence, and the jury will answer the second issue, Yes.

There are several reasons for refusing to give these instructions:

1. The answer does not allege that the plaintiff's intestate was guilty of contributory negligence in that he failed to perform the duties imposed upon him in the instructions, and a defend-

ant must allege and prove contributory negligence. *Stewart v. R. R.*, 137 N. C., 690. A liberal construction of the answer discloses that it alleges two acts of contributory negligence and no other.

(1) That the intestate was disobeying a rule by running in excess of six miles an hour.

(2) That he failed to stop when the lantern was waved.

2. The instructions imposed the duty without qualification to know the exact location of the switch in the absence of a light, and to note that the light was not there. The injury occurred in the night on a yard of the defendant where there were numerous tracks and switches, and it was for the jury to say, under these circumstances, whether he could, by the exercise of ordinary care, have discovered the absence of a light in time to stop the train.

3. They omit the rule of the prudent man. If the intestate knew there was no light at the switch, he also knew that he was running a first-class train on the main line, and that it was the duty of the defendant to have the track clear five minutes before his train reached the switch, and if there was danger to turn the red light to the main line. He had the right to assume that these duties had been performed, and under the circumstances the question was raised as to whether he acted as a man of ordinary prudence, which it was for the jury to decide. The instructions require the court to decide, as matter of law, that the facts embodied in them constitute contributory negligence.

4. They omit the element of proximate cause. If the intestate knew there was no light at the switch and was running in excess of six miles an hour, he was negligent, but it is not every act of negligence, on the part of the plaintiff, that is contributory negligence in its legal sense.

It is not contributory unless it is the real cause of the injury, nor is it so if the defendant, by the exercise of ordinary care, can avert the injury, notwithstanding the negligence of the plaintiff. There was evidence that an employee of the defendant was at the switch and knew it was broken when the plaintiff's intestate was distant one and one-fourth miles, that this em-

ployee could have turned the red light to the main line and failed to do so; that if he had done so, it could have been seen in time for the intestate to stop his train at the rate he was going.

If so, there was evidence that the failure to turn the red light to the main line was the proximate cause of the death of the intestate, and that notwithstanding the negligence of the plaintiff in failing to stop if he knew there was no light at the switch, that the defendant, by the exercise of ordinary care, could have averted the injury. It may be said that under the rules of the defendant, the absence of a light at the switch is notice of danger, and that if the intestate did not regard this, the display of a red light would not have caused him to stop. There is force in this view, but there may be a difference of opinion as to the conclusion. We think it would not be unreasonable to accept the other view, and conclude that if the intestate knew there was no light at the switch, he also knew it was the duty of the defendant to keep the track clear five minutes before his train reached the switch, and to display the red light if there was danger, and knowing these facts, he might proceed in the absence of a light, when he would not do so in the face of a red light, giving positive notice of danger.

The absence of a light would ordinarily indicate nothing except a failure to light the lamp, while a red light is a signal of danger.

"The law does not presume contributory negligence. It must be alleged and proven, and the defendant must show such facts, either omissions of such cautions or the doing of such acts, from which only one inference, to-wit, the plaintiff's negligence, can be drawn, by men of ordinary reason and intelligence." *Farris v. R. R.,* 151 N. C., 489.

We also conclude that the motion to nonsuit ought to have been denied. The open switch and the collision raise a presumption of negligence (*Stewart v. R. R.,* 137 N. C., 689, and cases there cited), and where such a presumption is raised or a *prima facie* case is established, the jury is justified in finding negligence, unless "satisfied upon all the evidence in the case

that in fact there is no negligence," as was said by *Justice Walker,* at this term, in *Kornegay v. R. R.*

There is also other evidence of negligence on the part of the defendant; two switches open or broken; the failure to maintain lights at the switch; the failure to keep the track clear, and the failure to notify the plaintiff's intestate of danger, as he approached the switch.

There is also evidence of negligence on the part of the intestate.

Under these circumstances, the fact upon which the decision of the case turned was proximate cause, and if there was a phase of the evidence that would justify the jury in finding that, although the plaintiff was negligent, the defendant had the last opportunity, the last clear chance to avoid the injury, it was the duty of the judge to submit the question to them. *Edge v. R. R.,* 153 N. C., 215, and cases there cited.

We have seen that the evidence presented this question. The jury could find from the evidence that an employee of the defendant was at the switch, and knew it was broken, and appreciated the danger to the approaching train when it was distant one and one-fourth miles; that he could have turned the red light to the main line in an instant, and that this would have been a warning of danger; that he failed to do so; that if he had done so the plaintiff's intestate could have seen the red light in time to stop the train before it reached the switch; that instead of doing so, he gave no signal until the train was in twenty-five yards of the switch, and then by waving a lantern some distance from the track and not across it, and if so, the jury could find that the negligence of the defendant was the proximate cause of the death of the intestate.

The jury could also reasonably find from the evidence that Rule 27, saying that "the absence of a signal at a place where a signal is usually displayed must be regarded as a stop signal," did not affect the right to recover because there was evidence that there was a light at the switch, and that the white light, a notice of safety, was turned to the main line. The plaintiff's intestate was killed about 2 o'clock A. M.   J. C. Mercer, a wit-

ness for the defendant, testified that he went to the switch at 8 o'clock A. M., and that the white glass was turned to the main line.   Between 2 o'clock and 6 o'clock the switch, lamps and yards were in the possession and under the control of the agents of the defendant, and no witness was produced to show any change in conditions or that the lamp was touched after 2 o'clock after the time Mercer saw the white glass turned to the main line.

The case was submitted to the jury with great care, and the contentions of the defendant were fairly presented.   The presiding judge, among other things, charged the jury:

"If the jury shall find that witness Cole waved his lantern across the track of the approaching train of which Boney was engineer and Boney saw the signal, or with the exercise of ordinary care could have seen it, it was his duty to have stopped the engine, and if he could have done so in time to avoid his injury, then he was guilty of contributory negligence, and the jury will answer the second issue, Yes.

"If the jury shall find that Boney was running his train at a greater rate of speed than six miles per hour at the time he passed the switch, and shall further find that this was the proximate cause of the injury, then he was guilty of contributory negligence, and the jury will answer the second issue, Yes.

"If the jury shall find that Boney did not obey the rules set forth in the time-table, that he must approach the middle-yard cross-over and the switch where the accident occurred with his train under full control and expecting to find the track occupied, but in disregard of this rule approached the said switch and cross-over without having his train under full control (and this was the proximate cause of the injury), then he was guilty of contributory negligence, and the jury must answer the second issue, Yes.

"Even though the jury shall find that the defendant was guilty of negligence, yet if they shall find that Boney did not obey the rules set forth in the time-table as to the rate of speed and manner in which he should approach the middle-yard crossing and switch where the accident occurred (and this was the

proximate cause of the injury), then he was guilty of contributory negligence, and the jury must answer the second issue, Yes."

We have examined each exception and find no error.

No error.

WALKER, J., dissenting. Without discussing other rulings of the Court which I think were erroneous and entitle the defendant at least to a new trial, I will notice a few which go to the very root of the case, and, in my opinion, are palpably wrong and work great injustice to the defendant. A railroad company would be grossly derelict in its duty, both to the public and its employees, if it failed to adopt such rules and regulations for the running and operation of its trains as make for safety, and it follows that the servant, for whose guidance in the discharge of his important and hazardous duties these rules are made, must obey them, and if he fails to do so and is himself injured by reason of his disobedience, he is to be regarded in law as the author of his own injury, and if thereby he injures others, the railroad company is liable to them, under the rule *respondeat superior,* and he is liable to the company for all damages caused by his negligence. *Holland v. R. R.,* 143 N. C., 435; *Haynes v. R. R.,* 143 N. C., 154. The intestate's death was caused, not by the negligence of the defendant, but by his own glaring disobedience of express orders and regulations, which if observed would have carried him on his train safely to his destination. He was not only disobedient, but his conduct was reckless, and, in consequence of it, he rode to his death. I think this appears from the plaintiff's evidence and the undisputed facts. The tragedy is regrettable, but the law must be administered with cold neutrality. With slight change, we may well repeat what we said in *Holland v. R. R., supra:* "The intestate was the one to whose keeping had been committed the safety of his comrades in the company's service (of the passengers on the train) and of his employer's property, and he was more responsible for it than any one else. He failed in the performance of his duty at the very moment when his obedience to orders and his vigilance were most required to prevent the resulting catastrophe. His negligence was ever present and the

efficient and, indeed, the dominant cause of his injury and death, reaching to the effect, and therefore proximate to it. To subject the defendant to a recovery in such a case does not seem to be equitable, and would certainly contravene established principles of law. Plaintiff's death was caused, not by the defendant's negligence, but by his own disobedience of instructions." If a servant disregards the express directions of his master, and pursues his own way in performing his duties, the resultant injury to himself, if any, the law imputes to his own wilful or negligent act, as the proximate cause, if not the only cause thereof. *Whitson v. Wrenn,* 134 N. C., 86; *Hicks v. Mfg. Co.,* 138 N. C., 319; *Stewart v. Carpet Co.,* 138 N. C., 60; *Biles v. R. R.,* 139 N. C., 532. The intestate simply did something which he was told not to do. He substituted his own will for that of his employer and his case falls within the maxim *volenti non fit injuria. Patterson v. Lumber Co.,* 145 N. C., 42. These principles are directly applicable to this case.

1. I think the motion to nonsuit should have been granted and for the following reasons: I will assume in the beginning that the red light was not displayed at the switch, and there is no evidence that the white, or safety light, was, so that the case must be considered as if there was no light. But that of itself is made a signal of danger, as much so as if the red light had been shown, and the duty of the intestate, by the very terms of the rule, was to stop his train. This was the mandate of the rule as much so as if there had been a red light there to warn him of danger. The order was not even to slow down or bring his train under control, but to stop at once, and herein is to be found the error in the opinion of the court as to proximate cause. If he had obeyed the rule and stopped, seeing that there was no light at the switch, the accident would have been a physical impossibility, for two trains, one at rest and the other moving away from it, could never collide. This is so very evident that I presume the Court should take judicial notice of it. It is as much an axiom in physics as that a man cannot be in two widely separated places at one and the same time, and as judges, we have no right to close our eyes to the existence of such a fact and refuse to take notice of it without proof and a finding of the

jury. We have the right to use our common sense, experience and observation as to certain matters, and this is one of them. It is said there is no evidence that Boney did see that there was no light at the switch. That is not the question. It was his duty to see—to keep a constant look-out—especially at this place, and if he failed to do so, it is the same in law as if he had looked and seen. *Arrowood v. R. R.,* 126 N. C., 629; *Whitesides v. R. R.,* 128 N. C., 229. We have so held in cases without number, when charging a railroad company with responsibility for the negligence of its engineer, and the decision must apply here, unless we recede from the position taken in those cases. In *Pickett v. R. R.,* 117 N. C., 616, it is said: "If he (the engineer) had looked and stopped the train, the collision would have been prevented, notwithstanding the previous want of care (or negligence) on the part of the boy who was killed." And again, after citing and referring to numerous cases of this Court, theretofore decided, on the same point, the Court says: "It was repeatedly declared in those cases that it was negligence on the part of the engineer of a railway company to fail to exercise reasonable care in keeping a lookout, not only for stock and obstructions, but for apparently helpless or infirm human beings on the track, and that the failure to do so, supervening *after the negligence of another* (the alleged negligence of Cole), where persons or animals were exposed to danger, would be deemed the proximate cause of any resulting injury." If he did not actually see, he would, in law, be taken to have seen, when he can see by looking, for he is not permitted to say, under such circumstances, that he did not look and, therefore, did not see. By the rules of the company and of the law, it was made his duty to keep a watchful lookout, and if he had looked he would have discovered, long before he reached the switch, that there were no lights burning there. If there was one, he would, by all the testimony, have seen it, and not seeing it, he was under a peremptory order to stop. He had no discretion in the matter. His duty was simply and solely one of obedience, and had he obeyed, the accident would not have occurred. What becomes of the doctrine of proximate cause? He knew where the switch was, for he gave the station blow two miles away as

he approached it, and the switch was between his train and the station. We have seen that he was negligent, if he could have known there was no light at the switch, and did not know. But General Burnett, witness for the plaintiff, who was in the cab with him, testified that the track was straight for at least two miles, and that he looked long before they reached the switch and saw no light there. Lights, red or white, were displayed at the switch before that time, and in all this he agrees with the other witnesses. He looked when Boney blew for the station, being then a half a mile from the switch, and saw no lights. There is no evidence to the contrary of this. No witness testified that he saw a white light, and the absence of such a light was a signal of danger and required Boney to stop his train. Speaking of a situation similar to this, the Court (*Connor, J.*), in *Haynes v. R. R.,* 143 N. C., at page 164, said: "Assuming that the light was out, or, as expressed by some of the witnesses, that the switch showed 'a dead light,' the rule imposed upon the plaintiff's testator the duty of treating it as a danger signal, and directed him how to act. The evidence was plenary that he knew the rule, and, if in force, *was under obligation to obey it."* But he was forbidden to run his train there at a greater speed than six miles an hour, and if he had been running at that rate of speed, he could surely have discovered as he approached the switch, that there was no light there and have easily stopped his train before entering the switch at the cross-over, but at that very time his speed, according to all the proof, was at least thirty-five miles an hour. His death, in any view of the evidence, as there is really no disputed fact upon this branch of the case, was due to his own negligence in two respects: 1. He did not heed the danger signal at the switch, if he saw it. 2. If he did not see it, he was negligent in not looking for it, and, in law, the same result follows. 3. He was running his train at a reckless rate of speed, in open violation of the rule fixing the rate at six miles an hour and a further rule requiring "trains to approach junctions prepared to stop," and "all trains passing Rocky Mount to approach the passenger station, main yard cross-over and middle-yard cross-over under full control, expecting to find the track occupied," that is, impassable.

If he had obeyed any one of these rules, the accident would not have occurred, but instead of doing so, he ran his train almost to its speed limit and nearly seven times as fast as he was authorized to do. Is proximate cause, in a case like this, a question of fact or of law? One of these rules required that he should approach the switch with his engine under full control, as if expecting to encounter danger ahead, and another that he should be prepared to stop unless both switches and signals are right and the track is clear. These rules were adopted to prevent just such a catastrophe as this one, and, too, for the engineer's safety, and yet this company is held liable to him for his own wilful and daring violation of them. He took his life in his own hands, but the road must pay for it. It is impossible to consider the evidence, as the law regards it, without seeing at once that the intestate brought disaster upon himself. Suppose a man had been lying drunk and helpless on the track at the switch and was run over and killed, would we hesitate to say, under our decisions and the *admitted* facts of this case, that the negligence of the engineer was, in law, the proximate cause of his death? How can one rule be applied to the engineer, when representing the railroad, and another man is killed, and a different one when, under identically the same circumstances, he is killed—his negligence being the same in both cases? There is but one answer to this question. The same rule applies alike to the two cases, unless our former decisions are founded upon the wrong principle and should be overruled. We must exonerate the defendant in this case or reverse a long line of decisions by this Court.

I have so far discussed the case upon the motion for nonsuit and the admitted facts, or upon the plaintiff's own evidence, favorably construed for her, and when thus considered, there is still another view of the case which conclusively makes against the plaintiff and defeats her right to recover. H. T. Cole, the engineer of the other train, ran down the track about twenty-five yards, and with his lantern signaled Boney to stop. Boney knew it was a *stop* signal, because plaintiff's witness, General Burnett, testified that when 200 to 300 yards from the switch he answered it with two short blasts of the whistle, shut off

steam and applied the emergency brakes.  Do we need a jury to tell us that, if he had been running at the proper speed—six miles an hour—he could have stopped his train within 150 yards, yes, within fifty yards?  We know it.  The evidence is that he could have stopped it, with the appliances at hand, within fifty feet, and this was not denied on the argument.  But the speed of the train was so excessive that he was unable to stop, and that was the only cause of the intestate's death.  By the rule he was ordered to have his train well in hand, so that he could stop in any emergency, if switches or lights were wrong or the track was blocked.  We *know* that he could have done so had he been so minded, but Burnett, plaintiff's witness, testified that Boney told him several weeks before the accident occurred that he had orders to run slow at that place, but that he increased the speed of his train from time to time until it reached the speed of thirty-five or forty miles an hour, at which it was running on the fateful night, and, too, by the switch with a danger signal displayed.  After he had received and acknowledged the lamp signal he had, by Burnett's testimony, 200 yards within which to stop his train before reaching the switch, and 75 yards beyond the switch where the collision occurred.  In all the cases heard by this Court since I have sat in it, and there are many of them, there has never been presented such an example of reckless indifference on the part of an engineer to his own safety and that of his passengers and fellow servants.  He deliberately violated the rule of the company, after telling Burnett that it had been issued to him, and persistently continued to do so, and did it, too, almost with the very words of the rule on his lips when talking to Burnett and while passing that very place, and yet this defendant must pay a heavy penalty for his flagrant disobedience and, too, pay it to him or his representatives.  This cannot be law, *because it is not just,* and such a ruling is utterly at variance with well-considered decisions of this Court holding railroad companies liable to third persons for similar acts of negligence by engineers, but of not so grave, serious and pronounced a character.  We have heretofore charged the company because such negligence we then considered to be the proximate cause of the injury, as in *Arrowood's case* and *Pickett's case* and

the long train of cases following them, and by this decision we discharge the engineer and, in effect, pay him for his own wrong. If in any one of the cases just mentioned the road had sued the engineer, after being held responsible for his negligence and mulcted in damages, could it have been entitled to recover? I think so. We have so intimated, and even held, in several of the cases. If so, how can the engineer in this case recover?

2. But if the nonsuit should not have been granted, the court erred in refusing to give the instructions requested. I will lay special stress and emphasis on one only—the seventh: "If the jury shall find from the evidence that at the time No. 82, the train being run by Boney, deceased, was approaching the switch into which he ran and the switch had no lights, either red or white, and Mr. Boney knew there were no lights, either red or white, as a signal at the switch at the time, and he failed to slacken his speed and stop his engine, then he was guilty of contributory negligence, and the jury will answer the second issue, Yes." It is said in the opinion of the Court that this instruction should not have been given, first, because there is no averment in the answer upon which it can be based, and second, because it is predicated on the fact that the intestate *knew* there was no light, of which there was no evidence. We will consider these reasons in inverse order. As to the intestate's knowledge that there was no light at the switch, it must be remembered that the instruction asks the jury to find the fact of knowledge, and does not assume that Boney had such knowledge. The only question, therefore, is, was there any evidence of knowledge? We have shown, I think, that it makes no difference, *in law,* whether he had actual knowledge or not, if by the exercise of the care exacted of him, he could have had it. But Burnett, plaintiff's own witness, testified that *he* looked and did not see any light. Could the jury infer from this fact and the further fact that it was Boney's duty to keep a lookout, that he did so, and if Burnett saw no light, that he saw none? But there is other evidence, far more than a scintilla, that Boney was looking, and what is it? He saw the signal lantern of Cole swaying to and fro, and he would not have seen it if he had not been looking. Another fact, he blew for the station as he saw its

lights, and was, therefore, looking ahead. Boney was familiar with the line; he knew he was within the yard limits, because there were several tracks and indications all around him show-ing that fact, and those on the engine showed by their testimony that they knew where the switch was with reference to the posi-tion of the approaching train. There are other facts and cir-cumstances which tend to prove knowledge by Boney in regard to the light at the switch. A man knows as well when he does not see a thing, as when he does see it. Am I wrong in making this common sense statement? If the light was not in sight, it was his duty to stop, and his failure to do so was not only gross negligence, but the decisive and proximate cause of his death, for if he had obeyed the rule and stopped, there would have been no collision. *He* had the last clear chance. No light being as much of a danger signal as a red light, it was his plain duty to so regard it. It was for his employer to make this rule and for him to obey it. It turns out that it was a wise rule, and an observance of it would have saved Boney's life. We have held that, under such circumstances, the employer is not liable to the servant because the latter has seen fit to disregard orders and act upon his own judgment, and it would not be right to hold the master responsible for the consequences. *Patterson v. Lumber Co.,* 145 N. C., 42; *Whitson v. Wrenn,* 134 N. C., 86. It will not do to say that his failure to stop the train was not the proximate cause; in the first place, because it was as a matter of law; and in the second, because if there was any duty resting upon Cole to turn the red light, when no light was itself a danger signal, and I think there clearly was not, Cole did give him a signal, equally as good and which he received in full time to stop his train if he had been running at a proper speed. He answered this signal and could easily have brought his train to a  full stop after doing so, but for his wilful disregard of orders as to speed. The company, by its rules, had prescribed a safe course for Boney to pursue, and it would have proved to be a most effective one. It was not required to provide more than one. If Boney had kept his engine under control, as if expecting to find the road blocked and the junction and switches in a dangerous condition—and this was what he had been

ordered, in plain language to do—he did not require any signal from Cole, as this duty was enjoined upon him without regard to the signal lights at the switch. Not only did he have this peremptory order, but Burnett testified that a light at the switch could have been seen two miles away on this straight track, and not seeing a light, as there was none there, his duty was to stop and ascertain the cause of this unusual situation. The opinion of the Court is based upon the erroneous hypothesis that Boney was entitled to have two signals of danger. *Edwards v. R. R.,* 132 N. C., 99. The company had the right to make the absence of a light a danger signal, and yet it is argued that even if Boney saw there was no light at the switch, he was entitled to have the red light turned to the track by Cole. The force of this reasoning is conceded in the opinion, and the answer to it is that Boney knew that, by the rules, the track must be kept clear five minutes before his train reached the switch. But that order was made in the interest of greater safety, and was to be executed by other employees, and Boney had no right to rely on its observance, for he was commanded to proceed with his train under control as if it had been violated and proper precautions had not been taken at the switch, and the track ahead was blocked so that he could not proceed on his way. By all the evidence, he ran in flagrant disobedience of orders, and at the rate of thirty-five miles an hour, into the switch and cross-over, and right by a danger signal. This is his case in a nutshell. The fallacy of the entire argument of the Court is that the premises are not justified by the admitted facts and the reasoning practically ignores the legal effect of the provisions of the rule, that the speed must not be in excess of six miles an hour; that no light shall be as much a danger signal as a red light, and that the engine must be kept under control, so that the engineer can guard against danger in any possible emergency. The instructions given by the court and copied in the opinion were erroneous because the first one required the jury to find that Boney could have stopped his train, then running at a high rate of speed, after seeing the signal of Cole, whereas they should have been told that if he was unable to stop it by reason of the excessive speed, and could have stopped it if he had been running at the

prescribed rate, his own act in disobeying the rule as to speed was the proximate cause of the injury, for the Court so held in *Norton v. R. R.,* 122 N. C., 911, and numerous other cases. The other instructions were faulty, in that they required the jury to find whether Boney's disregard of the rules was the proximate cause of his death, whereas the court should have told the jury that, as he was warned of the danger by the absence of a light, his failure to stop was the proximate cause of his death, as much so as if a red light had been displayed, and besides that, his failure to observe the rule requiring him to have his engine under control as if the track were blocked, and so that he could stop it if the track was not clear, was itself the direct cause of his death, for we have held in *Norton's case* and in many others that if the engineer deprives himself of the ability to stop his train by the disobedience of rules or because the train is being run at an excessive speed, it makes the company liable for any resulting injury to others, as the engineer's negligent act is "continuing" in its nature up to the very moment of the injury, and is, therefore, its proximate cause. If he had not been negligent in this way, he would have had the last clear chance to avoid the injury, and for this reason so would the company, his employer, when defendant has been charged with liability. *Edwards v. R. R.,* 129 N. C., 78. With greater reason does the law deny to him or his representatives the right of recovery, when his own negligent act caused the injury. My conclusion is that the plaintiff should, for the reasons stated, have been nonsuited, or that at least there should be a new trial, so that the case may again be tried according to correct principles; otherwise the defendant will be made to suffer vicariously for the fault of its engineer by compensating his representatives, contrary to the maxim of our law, *Nemo punitur pro alieno delicto.* Wingate's Maxims, 336.

But a difference is supposed to exist between a positive and a negative signal of danger. I think this is based upon a misapprehension of the rule, and that there can be no such distinction. The question is not what Boney thought the signal should be, but what it is. The "red light" and "no light" are made by the rule positive notice of danger. The mere fact that "no light"

involves the negation of a fact does not change the character
of the signal from a positive to a negative one, for the rule is
plain, *positive* and peremptory in its mandate that whether
there is a red light or no light, or even "a light imperfectly dis-
played," the engineer must stop and, in case there is no light,
ascertain the cause and report to the superintendent.   So that
a red light, no light, or an imperfect light are all equally "posi-
tive" stop signals, and so declared to be in express and unmis-
takable terms.   But if, under such a rule, an engineer could
have any margin of discretion in the matter, that avenue to
success is closed to the plaintiff by another mandatory order
contained in Rule 106 : "In all cases of doubt or uncertainty, the
safe course must be taken and no risks run."   So that if Boney
had any room for doubt or uncertainty, he should have stopped
his train.   There are two other similar rules.   No. 105 : "Both
conductors and enginemen are responsible for the safety of their
trains and, under conditions not provided for by the rules, must
take every precaution for their protection."   No. 707 : "The
company does not wish, nor expect, its employees to incur any
risks whatever from which, by exercise of their own judgment
and by personal care, they can protect themselves, but enjoins
them to take time in all cases to do their duty in safety, whether
they may, at the time, be acting under orders of their superiors
or otherwise."

It is suggested that the defendant has not sufficiently pleaded
the negligence of Boney in order to rely on it.   This seems to
me a very strained construction of the answer, one that is con-
trary to the express direction of the statute : "In the construc-
tion of a pleading for the purpose of determining its effect, its
allegations shall be liberally construed with a view to substan-
tial justice between the parties."   Pell's Revisal, sec. 495 and
notes.   The common law rule is modified and every reasonable
intendment is now made in favor of the pleader.   *Wright v.
Insurance Co.,* 138 N. C., 488.   We strictly enforced this pro-
vision in favor of the plaintiff, when charging negligence,
against the objection of the defendant in *Knott v. R. R.,* 142
N. C., 238, and the case is an authority here.   The answer, per-
haps, should have been more full and explicit, but I think it

quite sufficient, under the statute, to present the .defense. It distinctly avers that Boney had a copy of the rules, regulations and schedule, knew, or should have known, their contents, and that it was his duty to observe and obey them, while he failed to do so, and was violating the rule when he was killed. It is true defendant pleads specially the failure to heed Cole's signal with the lamp, but the answer embraces within its general scope an averment of negligence in disobeying the rules, and this is all set up as a separate defense, the purpose of the defendant to plead such contributory negligence, if necessary to do so in this case, being apparent. This answer is certainly as comprehensive in its allegations as was the complaint in the *Knott case*. No such point is hinted at in the plaintiff's brief, nor was it mentioned in the oral argument. Why? Because plaintiff's counsel were well apprised by the answer of the true defense. Their brief shows it, for it deals with all the questions now raised by the defendant and as if properly pleaded. There was no objection to any of the evidence as being irrelevant because addressed to the defenses that there was a stop signal at the switch, and that Boney did not, under the admitted circumstances, handle his train as required by the rules. But whether his negligence in this respect is pleaded or not, all the questions are presented by the denial of the answer. If the breaking of the switch was not an unavoidable accident, Boney, under a known rule, was warned of the situation by a danger signal which he was as much bound to obey, as we have seen, as if the red light had been in plain view. The defendant had safeguarded the place and neutralized its negligence, if any, by displaying a danger signal, which Boney was required to obey by stopping his train. If there had been a red light there, and Boney had disregarded it and been killed, would not his death be imputed to his own wrongful act as the proximate and sole cause thereof? I have shown that "no light" or an "imperfect light" was, by the very terms of the rule, as much a danger signal as a red light, and the same result must flow from his failure to so regard it. If the fireman had been killed at the same place, instead of Boney, would this Court listen to a plea, in an action against the defendant for causing his death, that Boney had failed to obey its

rules, or that he was not sufficiently acquainted with the road and surroundings to know that he was approaching the switch and middle-yard cross-over, where he was killed? I think not, for the reason that Boney's negligence, in such a case, would be held, in law, as the *decisive* and proximate cause of the fireman's death and the sole cause, however well the defendant had safeguarded the switch. There is no difference, in law, between the two cases.

It is further suggested that the witness, J. C. Mercer, testified that when he was there the white glass was turned to the track. This was not evidence that there was a white light burning at night. It tended to prove the contrary and, at most, was merely conjectural. *Byrd v. Express Co.,* 139 N. C., 273 (Anno. Ed.). It was no more evidence of a white light than the fact that the red glass was turned to the track would be of a red light. It is not the glass that gives the signal, but the light that is in it. Mercer did not say that there was a light in the glass, and if he had so stated, the plaintiff's own witness, General Burnett, testified that he saw no light there, and that a light could have been seen if one had been at the switch. *Edwards v. R. R.,* 129 N. C., 78. So in this conflict of testimony, if there is any as between Burnett and Mercer, the defendant was entitled to the finding of the jury as to whether there was a light or not, and if there was none, then to the other finding whether Boney knew it (or could have known it if he had looked, which is the same thing), for this was the form of the prayer. The defendant did not assume, in the requested instruction, that there was no light at the switch, nor that Boney knew there was none or could have known it, but asked that both inquiries be submitted to the jury for their finding of the truth in regard to it. Was it not plainly entitled to the instruction, even if the "white glass was turned to the track," and this is evidence that there was a light? It was not by any means conclusive and is not so treated in the Court's opinion.

My conclusion is that the plaintiff's intestate caused his own death by reckless conduct on his part. He did what his employer told him not to do, and however unfortunate the result, the defendant is not responsible for it, if we follow our former

unanimous rulings. *Whitson v. Wrenn,* and other cases, *supra.* They are all supported by many cases in this Court and by numerous decisions in other jurisdictions.

BROWN, J., concurs in this dissenting opinion.