HAYNES v. RAILROAD.

(Filed November 27, 1906).

*Railroads—Switches—Negligence—Presumptions—Contributory Negligence—Violation of Rules—Knowledge of Employer.*

1. It is the duty of a railroad to use reasonable care to provide and maintain a safe switch and to keep it properly adjusted, and the fact that it was not so adjusted and set to the main track, where, according to the regular schedule, a passenger train was expected to pass over it, raises a presumption that defendant's servants, entrusted with that duty, were negligent, and casts upon defendant the duty of "going forward" with proof to the contrary.

2. In an action against a railroad company for the death of an engineer whose train ran onto a switch at night, at which there was no light, and collided with cars standing thereon, in order to meet the defense of contributory negligence based on an alleged violation of a rule requiring decedent, when approaching a·switch, in the absence of a light, to bring his engine under control, in order to show that the rule had been so habitually violated as to nullify it, and that such violation was essential to the operation of the trains in accordance with prescribed schedules, it was competent to admit testimony of other employees as to the practise with respect to the lack of observation of such rule, the length of decedent's run, the schedule prescribed, the number of switch lights, their usual condition, and the length of time which would be consumed in conforming to the rule.

3. Where the orders given to an engineer by the general officers of the company required him to run in a different manner from that prescribed in the rules, and other trains of the class of that placed in his charge are so run with the knowledge and by the direction of the governing officers, negligence cannot be imputed to the engineer, although he does not follow the general rules.

4. The principle that a violation of a rule made by the employer for the employee's protection and safety, when the proximate cause of such employee's injury bars a recovery, does not obtain when the rule is habitually violated to the knowledge of the employer, or when the rule has been violated so frequently and openly, and for such a length of time, that the employer could, by the exercise of ordinary care, have ascertained its non-observance.

ACTION by Bettie W. Haynes, executrix of Tyler D. Haynes, against North Carolina Railroad Company, heard by *Judge Henry R. Bryan* and a jury, at the April Term, 1906, of the Superior Court of MECKLENBURG.

This was an action brought by the plaintiff executrix for the recovery of damages sustained by reason of the death of her testator on account of the alleged negligence of defendant's lessee. Plaintiff's testator was, on the night of 9 June, 1904, in the employment of Southern Railway Company, the lessee of defendant, in the capacity of locomotive engineer, and, in the discharge of his duty, was in charge of the engine attached to and forming a part of passenger train No. 40, operated by said lessee, which ran from Greenville, S. C., to Charlotte, N. C., and thence, over the main line of defendant company, through the city of Salisbury to Spencer, N. C.

On the said night, 9 June, 1904, while making said run, at about the hour of 12 o'clock, said engine and a portion of the cars left said track and ran onto a sidetrack, on the shifting yard of defendant, in the city of Salisbury, known as the "Ice-House Siding," where it collided with two box-cars standing on said siding, inflicting injuries upon said testator, causing his death.

Plaintiff alleged that the said engine left the main track and ran on the siding and into the box-cars by reason of the negligence of defendant's lessee, assigning three acts of negligence: 1. In failing to furnish a clear track and a safe roadbed upon which to run the engine and cars. 2. In failing to keep the switch at the siding in such repair, so adjusted, securely set, and locked as to keep disconnected said siding from the rail of the main track. 3. In failing to keep the switch rail of said siding, connecting the same to the rail of the main track, in such repair and so adjusted as to permit the engine to run over the said main track without running off the same and onto the siding.

Defendant denied that it was negligent in either of the respects specified, and for further defense alleged that plaintiff's testator came to his death by his own negligence, specifying particularly the acts contributing thereto: 1. That he was running his engine at the time it left the track and collided with the box-cars on the siding, through the city of Salisbury, at a rate of speed in violation of the ordinance of the said city. 2. That he was running said engine at said time at a rate of speed in violation of the rules of the company, which were well known to him, and which required him to run his engine at such rate of speed that he would have it under his control, whereas, he was running at a rapid and reckless rate of speed. 3. That at said time he was violating a rule of the company which required that whenever a danger-signal was shown on the line of said road, the engineer in charge of said train should stop and examine the cause thereof. That at the said time there was shown a danger-signal at said switch or siding, which was plainly visible for a distance sufficient to enable him to stop the train. 4. That at said time he was violating a rule of the company which required him to stop his train, if the signal which was provided for that purpose did not show the track clear. That by each of the said acts of negligence he contributed to his injury and death.

Plaintiff replied to the new matter set forth in the answer alleged to constitute contributory negligence on the part of her testator: That if her testator was running said engine through the city of Salisbury in violation of the ordinances of said city, he was obeying the orders of the agents and officers of defendant's lessee, with their full knowledge and consent. That it was frequently necessary to run said trains through said city at a rate of speed prohibited by said ordinances in order to maintain the schedules promulgated and enforced by said company. That her testator was not at said time running

his engine in violation of said ordinances. That if he was running said engine in violation of the rules of defendant's lessee, he was doing so by its direction and in accordance with the uniform habit and custom of the engineers of defendant's lessee, to run the trains at the place of the said siding and switch at as high rate of speed as her testator was running said train at the time of the collision. That such speed was necessary to enable her testator and other engineers to maintain the schedules promulgated by said company. That the rules referred to in the answer were and had been abrogated and rendered nugatory by the officers of the defendant's lessee, and that defendant was estopped from setting up or relying on said rules in this action, etc. That if her testator attempted to run said train by the said switch and siding when the signal-light was absent, his conduct in so doing was in conformity with the uniform custom and habit of her testator and all other engineers of said lessee company engaged in running over this line of railway from Greenville to Spencer, which custom and habit was for a long time known to and acquiesced in by the officers of said company and was necessary to maintain the schedules of said company.

Upon the foregoing pleadings, his Honor submitted to the jury the following issues: "1. Was the plaintiff's testator killed by the negligence of the Southern Railway Company, as alleged? 2. Was the plaintiff's testator guilty of contributory negligence, as alleged? 3. What damages was plaintiff entitled to recover?"

There was a verdict for the plaintiff and judgment thereupon, from which defendant appealed. The testimony pertinent to the exceptions is set forth in the opinion.

*Burwell & Cansler* for the plaintiff.
*W. B. Rodman* and *L. C. Caldwell* for the defendant.

CONNOR, J., after stating the case: The well-prepared briefs and arguments in this appeal present the merits clearly,

and in the light of the pleadings the decision turns upon two questions: First. Has the defendant, as a matter of law, successfully met the presumption of negligence raised by the fact that the switch was misplaced, by reason whereof the engine attached to train No. 40 collided with the box-cars on the siding? Second. Was there any competent evidence tending to show that the rule introduced by defendant governing plaintiff's testator in the management of the engine was, by reason of its habitual violation, known to defendant's lessee, or by the prescribed schedules, abrogated?

It appearing that the engine, while approaching Salisbury, left the main track at the "Ice-House Siding" and went upon the sidetrack, colliding with the box-cars, the presumption arises that the switch was defective either in its construction, was out of repair, or that, by some means, it was set to the siding instead of the rail of the main track. In either case the track was not clear, in the sense of being safe. We find no evidence that the switch was defectively constructed or was not in proper repair; but there is evidence, practically uncontradicted, that the switch was set to the siding: hence the engine, by the law of its construction and operation, could not do otherwise than, by following the rail, go upon the siding; this was inevitable.

It was the duty of the defendant's lessee to use reasonable care to provide and maintain a safe switch and to keep it properly adjusted. The fact that it was not so adjusted and set to the main track, where, according to the regular schedule, train No. 40, going north, was expected to pass over it, raises a presumption that defendant's agents or servants, entrusted with that duty, were negligent, and casts upon defendant's lessee the duty of "going forward" with proof to the contrary. This is conceded.

At the request of defendant his Honor, upon this point, instructed the jury:

"The defendant is not an insurer of the life of its employees; the defendant is not, under the law, required to guarantee that its employees shall be free from danger. The only duty that the defendant owed to the employee was to exercise that reasonable care which a man of ordinary prudence, under similar circumstances, would exercise to furnish the employees with a safe road-bed and a clear track. What would a man of ordinary prudence, under similar circumstances, do towards furnishing its employees with a safe road-bed and a clear track?

"The Court charges you that the only duty that the defendant owed to the plaintiff was to exercise that care which a man of ordinary prudence would exercise under similar circumstances to keep the switch set to the main line.

"If the jury should find from the evidence that the death of plaintiff's testator was caused by the derailment, which derailment was caused by the train or engine running into an open switch, then if the jury should find from the evidence that the switch was left open, or set to the sidetrack, by an employee of the company, who was not engaged at the time of the changing of the switch in working for the company, you will answer the first issue 'No.'

"If the jury should find from the evidence that the switch was set to the sidetrack by some person engaged in working for the company, and should further find from the evidence that, at the time, this person, whomsoever it was, was not actually on duty, but that it was done by an employee from a reckless and evil disposition, you will answer the first issue 'No.' ".

There was evidence tending to show that the switch was in good condition, worked all right; that immediately after the accident it was found with the lever latched down, the switch set to the sidetrack and the lock gone. That a train passing over it would not throw the switch. That on the morning

after the accident, about 10 o'clock, the lock was found, about one hundred and two feet from the switch, in a garden on the side of the track. That the switch was fastened by a standard switch-lock which could only be unlocked by a standard switch-key. The regulations of the road required an employee to sign for a switch-key, and when he left the service of the road to return it. That whoever took the lock off must have unlocked it, and must have had a key, that being the only way to do it. There was testimony in regard to the shifting of cars on the siding on the evening and night of the day of the accident and of the persons about the switch. That some of those in the employment of defendant's lessee in charge of the shifting crew had left the employment and were not present at the trial. There was also evidence in regard to the passing of trains over the switch during the early part of the night. His Honor fairly, and, we think, under proper instructions, submitted the question bearing upon defendant's negligence to the jury. We have examined the prayers for special instructions, which were refused, and concur with his Honor in declining to give them. While the complaint states plaintiff's contention, in respect to the alleged breach of duty on the part of defendant, in several aspects, we think that they all amount to the general allegation that there was a failure to furnish a clear track. The evidence points only to a change, either negligently or purposely, of the switch. It is difficult to perceive how this could have been done by any one other than some person having a key. His Honor correctly told the jury that if done maliciously, even by an employee, defendant was not liable.

The real contest in the trial below and in this Court was directed to the alleged contributory negligence of plaintiff's testator. It appears that the switch is supplied with a switch-lamp having four lenses, with two opposite each other. The white and red lenses are at right angles to each other; when

the switch is set for the main line it shows white up and down the main line and the red shows crosswise the track. When it is set for the sidetrack, the red shows up and down the main line and the white crosswise. The lamp sits on a two-pronged fork, nineteen feet high, eight feet north of the track. There is also a switch-target to indicate the position of the switch by day, the lamps by night. The box-cars were on the siding about 375 feet from the switch, with which engine No. 40 collided, turning over and killing the engineer. For the purpose of showing negligence by plaintiff's testator, defendant introduced a rule book, a copy of which was furnished to him and which he carried in his pocket. The rules relied upon are:

"*Rule 531.* When fixed signals are obscured by fogs or storms they must approach them at such a rate of speed as to be able to stop within the distance at which their indication can be distinguished. Should they be unable to see the indication of a signal without encroaching upon the danger-point, protected by it, they must stop clear of such point and send the fireman ahead to ascertain the indication and be advised thereof by him before proceeding.

"*Rule 533.* In approaching sidings and yards they must be especially careful as to the indication and position of all switches.

"*Rule 534.* They will be held accountable for passing a switch which is not in the right position for them. The absence of switch-lights should be taken as a danger-signal in accordance with the general rules.

"*Rule 535.* If the signal is missing, or does not show good light, from any main-track switch, they must report the fact by wire to the Superintendent from the first open telegraph office at which they stop."

There was evidence tending to show that on the night of the accident the lights had gone out. Plaintiff contended

143—11

that, while these rules had been promulgated and were known to her testator, they had been, for all practical purposes, or controlling the conduct of engineers on defendant's road, abrogated and overruled: 1. By habitual violation known to defendant's lessee. 2. By the promulgation and maintenance of schedules which rendered it impossible to observe the rules. For the purpose of making good this contention, plaintiff introduced Mr. Fogus, who testified that he was an engineer and had run fast trains over defendant's road—was then running from Greenville to Spencer, No. 35, fast mail. That No. 40 was a first-class train, having precedence over second-class and inferior trains. He was asked the number of switches between Greenville and Spencer. He answered 140. That the distance between Greenville and Spencer was 154 miles; that the schedule of No. 35 was four hours and fifty-two minutes, having 12 stops. No. 40 had four hours and forty-nine minutes, having 13 stops. That he was on the road every other night; a good part of the switch-lights were out. It depends on the weather how many were out, usually from 10 to 15; sometimes more, sometimes less. On stormy nights one-third to one-fourth would be out. Did not stop train when lights were out. Could not maintain the schedule and observe the rules in regard to switch-lights which were out. In regard to the time lost by stopping at switch-lights, it would depend upon the location of the switch: If down grade, not more than two or three minutes; if at the foot of a long grade, five or six; average four or five minutes—about one-half to one hour on an entire run. In response to the question: "Assuming the jury should find from the evidence the facts to be that as many as from 10 to 15 of the switch-lights, on an average, were out, from Greenville to Spencer, every night for a year prior to the 8th day of June, 1904, and that train No. 40 and similar first-class trains ran over the said track between said points, have you an opinion, satisfactory to yourself, as to

whether said train could have been run between said points and kept their schedule, and at the same time obeyed the rule of the Southern Railway requiring said trains to stop at each of said switches where said lights were out? and if you have such an opinion, state what it is." To which he responded: "I have an opinion. I do not think that they could obey that rule and hold the schedule. When the switch-light is out, you can see the target about two telegraph poles away by an electric light. A train running 35 miles an hour up grade I could stop in 130 yards; down grade it would take double that time; on medium grade 250 yards. Telegraph poles 90 feet apart. Would report, at end of run, number of lights out on run. Had done so six or seven months when Haynes was killed."

James C. Wallace, introduced by plaintiff, testified that he worked on Southern Railway from 1890 to 1899. Fireman and engineer; ran from different points, including Greenville to Spencer. Had frequently observed switch-lights out; knew the rules. Had seen the switch-lights out and in bad condition many times when running as fireman with Mr. Tankersley as engineer. Could never tell that he paid any attention to lights being out by way that he handled brakes. He seemed to be anxious to make schedule. Ran with other engineers when switch-lights were out. They did not stop trains or pay any attention to them. Has run a passenger train as engineer from Charlotte to Spencer. Switch-lights often out; did not stop for them; did not slacken speed—did not have time. Was violating rules. Was discharged from service October, 1899.

There was evidence that the usual speed of first-class passenger trains passing the switch at "Ice-House Siding" was 35 miles an hour.

The defendant introduced Mr. Tankersley, an engineer, who testified that when approaching switches, with danger-signal or when no light was shown, he always stopped, con-

tradicting plaintiff's witnesses; that he found but few lights out—not more than two or three, never more than four or five, on the run. When he approached a switch at which the light was not burning he observed the target, and if it was all right, would go ahead.

There was other testimony bearing upon the custom of engineers in passing switch when lights were out. All of this testimony was objected to by defendant, and to its admission exception was duly taken. We have deemed it best to discuss the several exceptions directed to its admission together.

The plaintiff, by way of meeting the defense of contributory negligence, based upon an alleged violation of the rule requiring her testator, when approaching the switch, in the absence of the white light, which indicated that the switch was properly set, to slow down until he could control his engine, sought to show, as we have seen, that the rules had been so habitually violated as to nullify them, and that such violation was essential to the operation of the trains in accordance with the schedules prescribed. For this purpose the testimony was competent. The only way in which plaintiff could maintain her contention, if at all, was by showing such a number of violations, during such a space of time and under such circumstances, known to defendant's officers and agents, as would substitute the practice for the rule. Whether the testimony, if found to be true, measured up to the required standard to work the result to which it was directed, is another question.

In the same way it was material and relevant to plaintiff's contention to show the distance between Greenville and Salisbury, the schedule prescribed, the number of switch-lights, their usual condition, the length of time which would be consumed in conforming to the rule to stop, etc. The value of the testimony, the knowledge and capacity of the witnesses, their temper and bias, if any, was for the jury. Assuming that the light was out, or, as expressed by some of the wit-

nesses, that the switch showed "a dead light," the rule imposed upon plaintiff's testator the duty of treating it as a danger-signal and directed him how to act. The evidence was plenary that he knew of the rule, and, if in force, was under obligation to obey it.

Mr. Giles testified that he was conductor of No. 40 on the night of the accident. That the engine ran into the switch at 12:30 o'clock, when running 35 or 40 miles an hour, which was the usual speed for first-class trains at that point. He got off and went to engine, returned to the switch in two or three minutes to learn the cause of the wreck. Found switch set for sidetrack, lock gone and light out; everything else in good condition.

Other witnesses for defendant testified to substantially the same facts in regard to the condition of the switch, etc.

If the testimony, taken as a whole, was fit to be submitted to the jury for the purpose of basing a finding that the rule was not, in respect to plaintiff's testator, alive and in force, the sole remaining question is whether there is error in his Honor's rulings in regard to the instructions to the jury. In *Biles v. Railroad,* 139 N. C., 528 (at page 532), *Mr. Justice Hoke* says: "The violation of a known rule of the company, made for an employee's protection and safety, when the proximate cause of such employee's injury, will usually bar a recovery. This is only true, however, of a rule which is alive and enforced, and does not obtain when a rule is habitually violated to the knowledge of the employer or of those who stand to the employer as vice-principals, or when the rule has been violated so frequently and openly, and for such a length of time, that the employer could, by the exercise of ordinary care, have ascertained its non-observance. Under such circumstances the rule is considered as waived or abrogated." Citing Thompson on Neg., sec. 5404; Beach Cont. Neg., sec. 373. "Knowledge on the part of the master of such habitual

violation need not be shown by direct evidence that the officers saw it practised, but notice may be inferred from circumstances, as from its notoriety, long standing, and that it was known to the company's employees." 20 Am. and Eng. Enc., 109 ; *Barry v. Hannibal and St. J. R. R.*, 98 Mo., 69. "Where an engineer placed his engine upon the main track of the road contrary to its prescribed rules, and it appeared the rule had been habitually violated by engineers for a period of at least one year, it was held that the question of defendant's negligence in not enforcing its rule was for the jury, and a finding of negligence by them was warranted." *Whitaker v. D. & H. Co.*, 126 N. Y., 544. *Sanborn, Circuit Judge*, in *North. Pac. R. R. v. Nickels*, 50 Fed. Rep., 722, discussing this question, says : "To hold that the defendant company could make this rule on paper, call it to plaintiff's attention and give him written notice that he must obey it and be bound by it one day, and know and acquiesce, without complaint or objection, in the complete disregard of it, by the plaintiff and all its other employees associated with him, on every day he was in its service, and then escape liability to him for an injury caused by its own breach of duty towards the plaintiff because he disregarded this rule, would be neither good morals nor good law." *Louisville & N. R. R. v. Reagan* (Tenn.), 33 S. W. Rep., 1050 ; *Tex., etc., Ry. Co. v. Leighty* (Texas), 32 S. W., 799 ; *Wright v. So. Pac.* (Utah), 46 Pac., 374; *Tullis v. Lake Erie & W. R. R. Co.*, 105 Fed. Rep., 554.

There is another view of the question regarding disobedience of the rules pressed upon our attention in the argument. Plaintiff says that it is shown by the testimony that between Greenville and Spencer there were 140 switches. That frequently as many as 10 or 15 of the lights were not burning. That engineers were required by the rules to report, and, the evidence shows, did report, this to the superintendent of the company, whose duty it was to attend to such matters. That

the officers and agents, therefore, knew of the conditions existing in this respect. That, in the light of such conditions, they promulgated and maintained a schedule for No. 40, and other fast mail trains, requiring a rate of speed which could not be maintained without violating the rule. That, thereby, they not only knew of such habitual violation, but, by imposing duties upon the engineers the performance of which rendered such violations necessary, abrogated the rule. That by reason of this condition the defendant is estopped from setting up and enforcing the rules to prevent a recovery for injuries sustained by its own negligence in failing to furnish a clear track and switch-lights.

The same contention was presented and discussed in *Hall v. Ch. B. & N. R. R. Co.,* 46 Minn., 439, in which *Mitchell, J.,* says: "The next point urged is that the plaintiff was himself guilty of contributory negligence in not reducing the speed of his train while running through the yard, so as to have it completely under control, as required by the rule, which counsel claims means that the speed must not be greater than that at which the engineer can stop his train within the distance that he can see danger ahead. This rule, like many of the others, does not command the doing or not doing of a particular specific act, but is one calling for the exercise of judgment and diligence on the part of the engineer, and must be construed in that view and considered in connection with the other rules of the company and responsibilities imposed upon engineers. It would seem that the construction which plaintiff himself put upon this rule is a reasonable one, that is, that he should have his train so under control that he could stop it before reaching the danger-point, if the proper signals were seasonably given him. But even if the rule, if standing by itself, might mean what defendant claims, yet, as to plaintiff, it was clearly modified by the schedule of time according to which these trains were required to be run, and were

actually run, presumably with the knowledge and at the direction of the defendant's governing officers. The plaintiff could not conform to the time-table and, at the same time, keep his train under complete control, in the sense in which defendant claims that term is used in the rules. If compliance with a general rule is rendered impossible by other and inconsistent orders given by the master to his employee, negligence cannot be imputed to the employee for not following the general rule."

The opinion from which we have made this citation is a strikingly able one, and much that is said in it is applicable to this appeal. It is cited by Judge Bailey in his work on "Personal Injuries," sec. 3455. The same doctrine is applied in *Penna. R. R. v. Raney,* 89 Ind., 453. *Elliott, J.,* writing for the Court, says: "When the orders given to an engineer by the governing or superior officers of the company require him to run in a different manner from that prescribed in the rules, and other trains of the class of that placed in his charge are so run with the knowledge and by the direction of the governing officers, then negligence cannot be imputed to the engineer although he does not follow the general rules. In this instance there was evidence fully justifying the jury in finding that the orders embodied in the schedule in the direction of the appellant's officers, and involved in the usual practise of the company, annulled and rendered ineffective its general rules, * * * the engineer was not guilty of contributory negligence in not seeing the condition of the switch. While, under the rules of the company, it was his duty to exercise great care and vigilance, he was not chargeable with negligence because he did not see what men could not have seen. * * * In addition to this, he knew he was entitled to a clear track, and he had no reason to suppose that it had been made dangerous by the culpable negligence of others." *Chicago, etc., R. R. Co. v. Flynn* (Ill.), 40 N. E., 332.

These authorities, which meet our approval, amply sustain plaintiff's contention in this respect. The evidence in regard to the schedule, distance, and number of switches was uncontradicted. Two witnesses testified to the number usually not lighted and two others swore to a much smaller number. The uncontradicted testimony shows that No. 40 was running at the usual speed when it reached the switch and just about schedule rate of speed. We think that there was evidence proper to be submitted to the jury upon both aspects of the controversy.

His Honor, in charging the jury upon the second issue, gave the instructions asked by defendant respecting the duty of the engineer to keep a careful watch and look-out for obstacles and defects in the track and condition of the switches, and his duty to take precaution to protect his train. Among other instructions, he said to the jury: "That under the rules of the company, it was the duty of the plaintiff, in approaching yards, to be especially careful as to the location of switches, and if the jury should find from the evidence that the deceased, by being specially careful, could have seen that the switch-light was out, in time to have stopped the train, you will answer the second issue 'Yes'—if the rule was alive and enforced." His Honor had before this instructed the jury in regard to the duty imposed by the rule and what must be shown before it could be treated as abrogated. In his general charge he adopted the language used by us in *Biles v. Railroad, supra.*

· The defendant took a number of exceptions to the refusal to give instructions regarding the condition of the road-bed. There was no controversy in regard to the road-bed. The answer to the first issue depended upon the view which the jury took of defendant's testimony in regard to the condition of the switch, the persons who used it during the day and night of the accident, and persons who had the key, etc. These were peculiarly questions for the jury.

It is not for us to conjecture how or by whose agency the plaintiff's testator, while in the discharge of his duty, relying upon defendant's lessee, his employer, to furnish him a clear track, was carried to his death by an open switch and a "dead light." It is not clear to our minds why in the defendant's shifting-yard, with so many of its employees moving about, having ample opportunity to watch and see the condition of the switch and that the light was out, it was left to the engineer to save himself, and his train loaded with passengers, from destruction. Doubtless the jury thought that the man who threw the key into the garden was the one who negligently left the switch set to the siding, and after seeing, when too late, the terrible disaster resulting from his negligence, divested himself of the evidence of his guilt, and when the trial came was not to be found. To say the least of it, much of the testimony was unsatisfactory, and the absence of two persons who had an opportunity to know something of the management of the shifting-engine on the day and night of the disaster justified the jury in finding that the defendant had not satisfactorily removed the burden which the law cast upon it. The engineer is dead. The conductor says that in two or three minutes after the accident he went to the switch; it was set to the siding and the light was out. It devolved upon the defendant's lessee to explain this condition of its track. It was its duty to use reasonable care to keep the rail to the main track and to keep a light burning. It failed in both.

Upon a careful examination of the entire record and the several exceptions made by defendant, we do not discover any error of which it can complain. The judgment must be

Affirmed.