CLARK, C. J., concurring in new trial.
This action was brought to recover damages for the death of plaintiff's intestate, alleged to have been caused by the defendant Standard Ice and Fuel Company's negligence.
On 28 June, 1919, plaintiff's son and intestate, Perry Fry, was instantly killed in a collision between an ice wagon of the Standard Ice and Fuel Company and a street car of the Charlotte Street Railway Company, at a point on Tryon Street about fifty feet south of the intersection made by Tryon and Ninth streets in the city of Charlotte. On that day Perry Fry was under 12 years of age, his exact age being 11 years, 10 months, and 23 days.
The railway company was repairing its tracks on North Tryon Street from Seventh to Ninth streets, and had dug up the concrete from between the rails and placed it in a pile, about two feet wide at (283) the bottom and eighteen inches to two feet in height, at the end of the crossties along the east side of the track, which had so *Page 303 
narrowed the driveway on the right or east side of the street that there was room for only one vehicle to travel at a time from Seventh to Ninth Street. This pile of concrete extended from Seventh Street to Ninth Street, with the exception of an open space about thirty feet in length just south of and about fifty feet distant from Ninth Street. It was in this open space that the collision occurred.
It was Saturday afternoon, about 4:30 o'clock, and the ice wagon, having completed its work for the day on Seventh Street, came out of Seventh into Tryon and proceeded northward on Tryon on its return to the ice plant, traveling on the east side of the street between the piled-up concrete and the curb-stone of the sidewalk. C. L. Hill, the white man in charge of the wagon, and whose duty it was to ride on the rear step of the wagon, had abandoned the wagon at Seventh Street, entrusting its safe return to the plant to the negro driver, Will Ferguson, and a half-grown negro helper, Robert Kinston. The latter, who was riding in the front seat with the driver, was so engrossed in eating his delayed mid-day lunch that he had no knowledge of the collision or its attendant circumstances except that the impact thereof threw him out of the wagon.
Somewhere between Seventh Street and the point of collision, a very congested section of the city, Perry Fry, and another small boy of about the same age, got on the rear step of the ice wagon, young Fry riding on that end of the step nearest the car tracks. This step was fourteen inches from the ground. Before reaching the open space the driver heard boys' voices behind his wagon, and on looking back saw young Fry riding upon the rear step. When the wagon came to the open space in the pile of cement fifty feet south of Ninth Street, the horses, without warning, were driven upon the street car track in a diagonal course toward West Ninth Street, and very near an approaching street car. The front wheels of the ice wagon were upon the car track when the street car, also running north, struck the hub of the left front wheel of the wagon, knocking the front of the wagon away from the tracks and throwing the rear of the wagon in toward the street car. Young Fry was thrown from the rear of the ice wagon under the street car between the trucks, and when the car was stopped within its own length he was lying under the rear trucks of the street car. The left horse was down on the track with its feet in the fender of the car. Young Fry was dead when removed from under the street car.
It had been the custom for many years for little children to ride upon the rear step of defendant's wagons for the pleasure of the ride as well as to get ice. This custom was known to the defendant, and had been constantly permitted by the drivers of its wagons. There (284) *Page 304 
was danger in children thus riding on the wagons of this defendant, which was also known to the defendant.
The city of Charlotte had, before the time of this fatality, adopted the following ordinance, which was then in force: "No vehicle shall be turned unless a signal shall previously be given by the whip or hand indicating the direction in which the turn is to be made. The driver of any vehicle, upon a track in front of a street car, shall, upon signal from the driver or motorman of said car, turn to the right of the track. The vehicles moving slowly shall keep as close as possible to the curb on the right of the street, allowing more swiftly moving vehicles free passage to their life. A vehicle overtaking another shall pass on the left side of the overtaken vehicle, and shall not pull over to the right until entirely clear of the vehicle passed. A vehicle, when turning to the left to enter an intersecting street, shall slow down to a speed of five miles per hour, and shall not turn until it shall have passed beyond the center of such intersecting street."
There was testimony that the defendant had knowledge of this custom of small children riding on its wagons, and also that it had actual knowledge, through its driver, that the small Fry boy was on its wagon some time before the collision occurred which resulted in his death. Will Ferguson, the driver, testified: "As I was driving down Tryon Street that afternoon, between Eighth and Ninth streets, there was an opening just ahead of the left side where no broken concrete and rock had been piled upon or in the street. I heard a boy's voice behind my wagon say `Come on up,' `Come on up,' and I looked around through the wagon and saw this little white boy who got killed standing on the rear step." The driver did not stop to put the boy off, nor did he tell him to get off. He drove his wagon through the open space 50 feet from the street intersection and upon the car track and close to the approaching street car. W. J. Dellinger testified that when the wagon looked like it was going to cross, "the street car was not far south of that open space, they were right close together." R. F. Rankin testified: "The street car and the ice wagon were very close together when I noticed the ice wagon," before the collision. Willie Wilson, who was on the street car, testified that the "car was somewhere about the middle of the block" when the horses started upon the tracks. R. A. Galloway testified that the horses' heads were about six feet from the open space when the car was about the middle of the block. Neal Elliott, the motorman, testified that the car was only fifteen feet away when the horses started upon the track. M. T. Kelley, Fred Stewart, and W. P. Chambers testified that the street car was twenty feet away when the horses started to cross the track. Not only was the wagon driven upon the car *Page 305 
tracks in close proximity to the approaching car, but in turning (285) to cross the tracks the driver did not hold out his hand or give any signal of his intention to cross. Neal Elliott, the motorman, testified: "The driver did not throw out his hand or warn me." Fred Stewart, who was standing at the corner of Ninth Street in front of the wagon and in a position to see the actions of the driver, testified: "Saw the ice wagon and the driver when the horses started across the track. The driver just started across there and the street car hit the front wheel. Did not see the driver throw out his arm; he did not throw out anything. He did not look." This witness further testified: "The driver of the ice wagon was not paying any attention to anybody or anything. He did not look to the side of him, nor behind him, nor do anything except to drive the horses across there at a slow trot; he moved across diagonally."
The driver of the wagon testified that just as he reached this open space an automobile passed on his right next to the curb, and that as a result his horses shied and thus got upon the car tracks. Nowhere do we find in the record any evidence which supports the testimony of the driver in this regard. The eye-witnesses introduced by both the plaintiff and the defendant, except the driver, said the horses were driven upon the tracks, and that no automobile passed the ice wagon at or near the time of the collision. C. G. Terrell, the only eye-witness introduced by the defendant, except the driver, testified: "The horses were responsive to the driver; they moved as if they were being moved by the driver." And again the defendant's same witness testified: "When I saw the horses start to turn across the track the street car was between the center of the block and Ninth Street. The street car was not ringing any bell, and from that time on the horses proceeded diagonally across the track in the open space and the street car came right after them."
Nor was there sufficient room between the concrete piled up along the rails and the curb for an automobile to pass the ice wagon. W. J. Dellinger testified: "There was plenty of room to go along for one, but I don't hardly believe there was room for two." R. F. Rankin testified: "There was only one passway. This obstruction on the side of the street would not permit but one car to go through there. An automobile could not pass the ice wagon as it was going down there." J. D. Johnson, a police officer, testified: "Two automobiles could not have passed in there from Seventh Street down to Ninth Street with the material piled up there to the right of the rail."
The evidence in the record appears to contradict the driver, and shows that no automobile did pass the ice wagon. W. J. Dellinger, who was driving in an automobile in the same direction with the wagon and *Page 306 
about a block and a half behind the ice wagon, testified: "Saw no automobile behind the ice wagon. Could not see the front of ice (286) wagon. There was not any vehicle to the side or behind it from the time I first saw it and the collision occurred. There was not any automobile passed the ice wagon after I saw it. I did not see an automobile come and go by this ice wagon and cause the horses to shy across the track; none passed the ice wagon. No automobile between me and the ice wagon; nothing but the ice wagon and the street car in front of me." R. F. Rankin, who was in the automobile with Dellinger, testified: "There was no car or other vehicle between me and the ice wagon when I saw it. No car passed the ice wagon about the time of the collision or before. I was going down the street behind the street car and the ice wagon. If there had been an automobile between me and the ice wagon I certainly would have seen it." Even the negro helper, Robert Kinston, riding in the front seat with the driver, saw no automobile pass the ice wagon.
A perusal of the record will tend to show, as the jury evidently found, that Hill, the man in charge of the wagon, had abandoned it at Seventh Street; that the driver drove across the street fifty feet south of the intersection in violation of an ordinance of the city of Charlotte; that in doing so he failed to give any signal or warning of his intention to cross in violation of the ordinance, and that, without looking or listening, and knowing that young Fry was in a position of danger on the back of his wagon, as the evidence tends to show and the jury found, he drove across the street in dangerous proximity to an approaching street car. There was at all events sufficient evidence to carry this question of fact to the jury.
Other material facts will be noticed in the opinion of the Court.
The judge charged the jury, as to the fifth issue, as follows: "If you find by the greater weight of the evidence that the street car in question was being operated at a lawful rate of speed, and that the motorman had given all necessary and proper signals of the approach of the car to the ice wagon in question, and also of his approach to the Ninth Street crossing, notwithstanding which facts, the driver of the ice wagon, after he saw, or by the exercise of ordinary care could have seen, the approach of the street car, negligently and recklessly, without signal or warning of any kind, and without looking or listening, drove his wagon upon, or dangerously near, the said street car track in such close proximity to the approaching street car as to render it impossible for the motorman in charge of said car to avoid a collision with the wagon, either by slackening the speed of his car or stopping the same, after he saw a collision was imminent, and that the driver knew the *Page 307 
perilous situation of the ice wagon, then the court charges you that the driver of the ice wagon would be guilty of willful negligence, and if you find such negligence was the proximate cause of the intestate's death, then you will answer the third issue `Yes.'" And the (287) judge further charged the jury, on the fourth issue, as follows: "If the jury find by the greater weight of the evidence that with knowledge of the fact that the boy was riding on the rear step of the ice wagon, said driver willfully and wantonly drove his wagon across the said car track, without either looking or listening for the approach of a car or giving any signal or warning of his intention to drive the wagon on or across the track, and shall further find by the greater weight of the evidence that the motorman in charge of said street car saw, or by the exercise of ordinary care could have seen, this boy on the rear steps of the ice wagon, if you find he was there, notwithstanding which he willfully operated said car at a speed between 20 and 30 miles an hour between Eighth and Ninth streets, in violation of the ordinance of the city of Charlotte, and that the aforesaid willful and negligent acts of the motorman and driver of the car and wagon were the sole and only concurring proximate causes of the plaintiff's intestate's death, then you will answer the fourth issue `No,' independently of whether the plaintiff's intestate was a trespasser upon the ice wagon at the time of the collision or not."
The jury returned the following verdict:
"1. Was the plaintiff's intestate killed by the joint and concurrent negligence of the defendant, as alleged in the complaint? Answer: `No.'
"2. If not, was the plaintiff's intestate killed by the negligence of the defendant Southern Public Utilities Company, as alleged in the complaint? Answer: `No.'
"3. If not, was the plaintiff's intestate killed by the negligence of the defendant Standard Ice and Fuel Company, as alleged in the complaint? Answer: `Yes.'
"4. Did the plaintiff's intestate, by his own negligence, contribute to his death? Answer: `No.'
"5. What damages, if any, is the plaintiff entitled to recover? Answer: `$5,000.00.'"
Judgment on the verdict, and defendant Standard Ice and Fuel Company appealed.
After stating the case: If the first assignment of error is sufficiently stated under our rules, we are of the opinion that it is without any substantial merit. It was competent to prove the custom of small boys to jump upon the rear step of the wagon to ride (288) and get bits of ice for several reasons, and, among them, to answer the contention of defendant that instructions had been given to the drivers not to permit riding on the wagon by small boys. If such order was given, the plaintiff surely was entitled to show that it had been constantly violated for a long time, with the knowledge of the drivers and those in charge of the wagon, from which the jury could well infer that the owner of the wagon had notice of its nonobservance, and that it was an order of the company more honored in the breach than in the observance, and, in legal contemplation, it had been abrogated, or at least waived. Biles v. R. R., 139 N.C. 528; Haynes v. R.R., 143 N.C. 154; Smith v. R. R., 147 N.C. 603; Bordeaux v. R. R.,150 N.C. 528; Railway Co. v. Mobley, 6 Ga. App. 33; P. L. Co. v. Whitzel,118 Va. 161; Robinson v. R. R., 71 W. Va. 423; Railroad Co. v. Reager,96 Tenn. 128. It has been held generally that if a rule is made for the safety of the servant or others, but its customary violation has continued so long that the master either knew of it, or could by the exercise of ordinary care have found it out and acquiesced in it, he is presumed to have consented to its repeal, or to have waived obedience to it.Smith v. R. R., supra; Biles v. R. R., 143 N.C. 78. But so far as the rule, or order to the drivers, in this case is concerned, it does not appear to have been observed at all, and boys were allowed to ride on the rear step of the wagon at their pleasure, even when the manager of it, who had left on this occasion, was there. All this evidence, and more, is sufficient to show, at least, the tacit consent of the driver and manager to such a course of conduct by them, and the jury have doubtless so found. If this be so, and it can hardly be disputed, the act of this young boy was not within the prohibition of the city ordinance forbidding it only when it is without the consent of the driver, or person controlling its movements and management. As this is a question of capital importance in the decision of the case, we will refer to some of the evidence bearing upon it: For many years it had been the habit and custom for small children to get upon and ride upon the rear of defendant's ice wagons, both for the pleasure of riding and for the purpose of getting small pieces of broken ice. In doing so they rode from door to door, and frequently for considerable distances out *Page 309 
of the neighborhood in which they lived. So general had been this practice and so long continued that one witness, in referring to it, said: "It has always been." This custom was known to the officers and agents of the defendant company, or by the exercise of ordinary care they should have known it, and in legal contemplation the defendant did know of this custom. But aside from this legal presumption, actual knowledge of this custom, it seems, was brought home to the defendant, its officers and agents. C. L. Hill, the man in charge of this particular wagon testified: "Little fellows, six (289) years old up to eleven and twelve, had this habit of getting on the wagon." J. A. Eagle, assistant manager of the defendant company, in testifying with regard to this custom, said he had observed it "ever since he had been in the ice business." C. R. Moore, manager of the defendant company, said he knew of the existence of the custom "in a limited way." More than that, the defendant's driver knew of the custom, permitted it to grow up, and even encouraged it, offering the inducement of cool rides and bits of cracked ice. But defendant contends that the admission of the evidence as to this custom was error, upon the general ground that it was an illegal custom and that it grew up in violation of an ordinance of the city of Charlotte, which declares "that no one shall ride or jump onto any vehicle without the consent of the driver thereof; and no person, when riding, shall allow any part of his body to protrude beyond the limits of the vehicle, nor shall any person hang on to any vehicle whatsoever." If that position were sound, then any defendant could escape the consequences of his wrongful act by the mere device of alleging and proving that his conduct had been unlawful. But even if the position of the defendant be a correct one, then it is equally true, as the record clearly shows, that this custom had grown up with the consent of the drivers of the defendant's wagons; and, therefore, it was not forbidden by the ordinance. In Ferrell v.Cotton Mills, 157 N.C. 528, and many other cases to like effect, evidence was admitted to show the custom or habit of small children to play upon premises where they were technical trespassers. If in those cases evidence was competent which proved a custom, in violation of the laws against trespass, then certainly in this case evidence of a custom in violation of an ordinance of the city of Charlotte was competent. Having permitted this custom to grow up, this defendant cannot take shelter behind his own wrong. "A habit of doing a thing is naturally of probative value as indicating that on a particular occasion a thing was done as usual; and, if clearly shown as a definite course of action, is constantly admitted in evidence." 1 Greenleaf's Ev. (16 ed.), sec. 14J. *Page 310 
Leaving this subject, we come to the next material question in the case. Having concluded there was evidence that young Fry did not violate the ordinance, or that there was evidence that he did not, and the jury so found, was he guilty of contributory negligence? We take this matter up now before considering the issue as to defendant's negligence, as it is more nearly related to, and connected with, the one just before discussed. The jury found that he was not guilty of any negligence himself which contributed to his injury and death, but the defendant contends that this answer of the jury was induced by an (290) error of the judge in his charge to them, which they say is that "as young Fry was under twelve years of age, he could not be guilty of negligence." He was one month and seven days under twelve. This, we think, was error. The error consisted in charging the jury that the boy being under twelve years of age was incapable of committing the alleged negligent act which it is claimed contributed to his injury. The responsibility of an infant for contributory negligence is not necessarily a question of law and some expressions in our reports apparently to the contrary are misleading and contrary to the accepted and approved principle which governs in such cases. The question was so fully discussed, with a copious citation of the well considered cases inAlexander v. Statesville, 165 N.C. 527, that much further comment would seem to be useless. It was there held, as stated in the seventh headnote, that while a child of tender years is not held to the same degree of care as one of mature years in avoiding an injury arising from the negligent act of another, it is ordinarily a question of fact for the jury to determine, in his action to recover damages therefor, whether, under the circumstances, and considering his age and capacity, he should have avoided the injury complained of by the exercise of ordinary care; and in that case it appearing that the plaintiff was a bright boy of about 7 years of age, it was held that the court properly left the issue of contributory negligence to the jury. We cannot approve all that was said, with respect to this question, in Baker v. R. R., 150 N.C. 562, and Foard v. Power Co., 170 N.C. 48, though expressions will be found therein which seem to agree with the view herein stated. In Alexanderv. Statesville, supra, we followed the rule as adopted by the Supreme Court of the United States in Railroad Co. v. Gladmon, 15 Wallace (U.S.), 401 (21 L.Ed. 114), and Railroad Co. v. Stout, 17 Wallace (U.S.) 657 (21 L.Ed. 745). Gladmon's case has been followed by this Court in Manly v. R. R., 74 N.C. 655; Murray v. R. R., 93 N.C. 92;Bottoms v. R. R., 114 N.C. 699. In Bottom's case the Court refers toGladmon's case and Robinson v. Cone, 22 Vt. 213, as stating the correct rule, and takes this passage from the Robinson case: "All," says *Page 311 Judge Redfield, in delivering the opinion, "that is required of an infant plaintiff in such a case (where a child was injured in a highway) being that he exercised care and prudence equal to his capacity." The passage which we have taken from Gladmon's case was quoted by Chief JusticeSmith, with full approval, in Murray v. R. R., supra, as containing a correct statement of the rule applicable in such cases. Numerous other cases are cited in Alexander v. Statesville, supra, at p. 536 of 165 N.C. It was held in Westerfield v. Levis, 43 La. Ann. 63 (cited in the Alexander case), that the rule which exempts a child of tender years from responsibility, while it may not operate justly in every possible case, on the whole promotes the ends of justice, (291) and the Court followed the authorities which held that a child of the age of appellant is prima facie exempt from responsibility, but also held that testimony is admissible to show the contrary, citing many authorities. We said in the Alexander case that upon the question of plaintiff's contributory negligence, the judge properly confined his charge to the second issue, which separately and independently involved an inquiry into that matter, as to the plaintiff's age and his incapacity arising out of his tender years, and it may be said that the question of contributory negligence on his part is not to be determined alone by the fact of his youth, except in extreme cases; but other considerations enter into the question, as, for instance, his degree or capacity or intelligence. Some boys are brighter, smarter, more precocious, and more capable than others who are much older, and better able to take care of themselves. The youth of the person must be considered, of course, but, with the qualifications already made, it is not the only test, and the presumption of incapacity to protect himself is not always a conclusive one. In Rolin v. Tobacco Co., 141 N.C. 300, this Court said: "It is hardly necessary to add that contributory negligence, on the part of the minor, is to be measured by his age and his ability to discern and appreciate the circumstances of danger. He is not chargeable with the same degree of care as an experienced adult, but is only required to exercise such prudence as one of his years may be expected to possess. As the standard of care thus varies with the age, capacity, and experience of the child, it is usually, if not always, when the child is not wholly irresponsible, a question of fact for the jury whether a child exercised the ordinary care and prudence of a child similarly situated; and if such care was exercised, a recovery can be had for an injury negligently inflicted, no matter how far the care used by the child falls short of the standard which the law exacts for determining what is ordinary care in a person of full age and capacity," citing Am. C. and F. Co. v. Armentrodt, 214 Ill. 509; Plumly v. Birge, *Page 312 124 Mass. 57; 7 A. E., 409. Labatt on Master and Servant (Ed. 1904), sec. 348, says that the essential and controlling conception by which a minor's right of action is determined with reference to the existence or absence of contributory fault is that his capacity is the measure of his responsibility. If he has not the ability to foresee and avoid the danger to which he may be exposed, negligence will not be imputed to him if he unwittingly exposes himself to that danger. For the exercise of such measure of capacity and discretion as he possesses, he is responsible. And quoting from Gladmon's case, supra, this Court further says: "The rule of law in regard to the negligence of an adult and the rule in regard to that of an infant of tender years is quite different. By the adult there must be given that care and attention (292) for his own protection that is ordinarily exercised by persons of intelligence and discretion. If he fails to give it, his injury is the result of his own folly, and cannot be visited upon another. Of an infant of tender years less discretion is required, and the degree depends upon his age and knowledge. Of a child of 3 years of age less caution would be required than one of 7; and of a child of 7, less than one of 12 or 15. The caution required is according to the maturity and capacity of the child, and this is to be determined in each case by the circumstances of that case."
But if it be admitted that the boy was guilty of contributory negligence, the question whether it was the proximate cause of his death remains to be determined by the jury, under proper instructions from the court. "Where defendant, by exercising due care, can avoid the consequences of plaintiff's negligence, or he can discover plaintiff's peril in time to avoid injuring him, he is liable on his failure so to do." Cullifer v. R.R., 168 N.C. 309. "The doctrine of the last clear chance applies where the defendant, after he discovers plaintiff's peril, or in the exercise of ordinary care should have discovered it, negligently fails to avoid the accident." N. S. R. Co. v. White's Admr., 84 S.E. 646. The jury have found, with evidence to warrant the finding, that the driver knew the boy was on the rear step of the wagon, and had given him permission to ride there, and that, notwithstanding this knowledge, he drove onto the track, in front of the fast approaching street car, and his wagon was struck by the same, and this caused the intestate's injury and death. The driver of the defendant testified that some one drove an automobile between him and the curb of the sidewalk, which frightened his horses and caused them to turn and drag his wagon onto the track, but there was evidence to the contrary, and especially by a witness, who was riding in his automobile and a little behind the ice wagon, and who stated that he was in full *Page 313 
view, and that no such thing occurred, and the jury, under the evidence and the instructions of the court, not only found that the driver's testimony was not true, but that, on the contrary, he drove both "negligently" and "recklessly" upon the track. This appears from the instruction of the court on the third issue, as set forth in our statement of the case and the verdict. He also drove on the track "willfully and wantonly," as appears from the instruction of the court upon the fourth issue. There was evidence that the wagon was driven upon the track in violation of a city ordinance, which provided that the driver, in order to cross over to the other side of the street, should make his turn at the intersection of Tryon and Ninth streets, or if he intended to go as far north as Tenth Street, then at the intersection of Tryon with Tenth Street, and that, by the ordinance, he should have turned in on the north side of Ninth Street, or of Tenth Street, depending (293) upon where he expected to make the crossing. The plaintiff contends, therefore, that he was acting, not only negligently, recklessly, willfully, and wantonly, but criminally, as he was violating the ordinance. We must construe the verdict always in the light of the evidence and the charge of the court, and especially as resolving all inferences in favor of the successful party. Aldrich v. Railway Co., 79 S.E. 316. We have held repeatedly that the verdict must be interpreted "and allowed significance" by reference to the pleadings, testimony, and the charge of the court. Owens v. Ins. Co., 173 N.C. 373; Taylor v. Stewart,175 N.C. 199; Bank v. Wysong, 177 N.C. 284. If we follow these decisions and interpret this verdict by proper reference to the pleadings, evidence, and charge, there can be no doubt as to what was the conclusion of the jury, which is that the driver of the wagon, regardless of any contributory negligence of the boy, acted not only negligently when he had the chance to save him, but willfully, recklessly, and wantonly, and against such conduct as this finding implies, the contributory negligence of the boy is no protection or bar to the plaintiff's recovery. If the party injured is himself ever so negligent, the one who caused that injury is liable to him for the ensuing damages, is he was aware of the dangerous situation and caused the damage willfully, wantonly, or even recklessly, that is, if he did so without regard to the consequences of his act and being indifferent to the rights of others. It is said in a standard treatise: "The doctrine that contributory negligence will defeat recovery has no application where the injury is the result of the willful, wanton, and reckless conduct of defendant. . . . In order that one may be held guilty of willful or wanton conduct, it must be shown that he was conscious of the surroundings, and was aware, from his knowledge of existing conditions, *Page 314 
that injury would probably result from his conduct, under the circumstances, and, with reckless indifference to consequences, he consciously and intentionally did some wrongful act or omitted some known duty which produced the injurious result." 29 Cyc. 509-510. And in Brendlev. Spencer, 125 N.C. 474, this Court held: "It is settled that contributory negligence, even if admitted, is no defense to willful or wanton injury. The finding of such injury by the jury eliminates all question of negligence on both sides. The defendant company is responsible for the willful and wanton injury occasioned by its employee while on duty in its service."
We do not mean to say that the driver's act in crossing at the wrong place, contrary to the ordinance, if he did so, would of itself constitute willfulness, but it may be considered as one of the facts or circumstances in evidence tending to show that his act was willful, as being entirely regardless of the law and the safety of others. We have held (294) that where a statute or an ordinance is violated it is such a distinct legal wrong that if it be the proximate cause of the injury to another, it will then constitute an actionable wrong or tort, but the jury must find the facts essential to the application of this principle.Stone v. Texas Co., 180 N.C. 546, where the matter is fully discussed.
We finally conclude that there was some evidence from which the jury could find that the driver of the wagon was guilty of culpable negligence, or a distinct legal wrong, as hereinbefore defined by us, and the defendant itself may, therefore, be liable to the plaintiff upon the principle ofrespondeat superior, the driver being its servant and his illegal acts being imputable to the defendant. If knowing that the boy was on the wagon, and he was there by the driver's consent, or permission, the defendant would have to answer for his negligence if he exposed the boy to impending danger in crossing the track too near to the approaching street car, and especially so if the act of crossing the track under the circumstances was forbidden by the ordinance, and was the proximate cause of the injury to the boy which caused his death.
This Court will not undertake to decide the case upon the evidence, but will leave its weight and sufficiency to the jury. It may be that the defendant's construction of the evidence is the correct one, and that the plaintiff's is not. The Court must not be understood as intimating any opinion at all upon the weight of the evidence, or any of it, but as leaving its sufficiency to establish the contention of the plaintiff, or that of the defendant, entirely to the jury, with proper directions from the court.
The error of the judge as to the contributory negligence of the boy is of sufficient importance to have been prejudicial to the defendant, and *Page 315 
because of it a new trial must be had in order that the case may be submitted again to the jury under proper instructions.
New trial.